Filing # 211509180 E-Filed 11/21/2024 06:45:27 PM

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION

| | |
|---|---|
| SOFLAC ASSOCIATES, LLC, RMP INVESTMENTS, LLC, MCANDREW PHILLIPS & COMPANY 401K PLAN, MATTHEW H. PERLMAN, JUDY PERLMAN, AND RICHARD M. PERLMAN,<br><br>PLAINTIFFS,<br><br>-AGAINST-<br><br>LESLIE ROBERTS, MIAMI FINE ART GALLERY LLC, AND ALEX HERMAN,<br><br>DEFENDANTS. | Case No. 2024-016550-CA-01 (CA 43) |

## AMENDED COMPLAINT

Plaintiffs SOFLAC Associates, LLC ("SOFLAC"), RMP Investments, LLC ("RMP"), McAndrew Phillips & Company 401K Plan ("MPC-401K") (together, the "Perlman Entities"), Matthew H. Perlman, Judy Perlman, and Richard M. Perlman (together, the "Perlmans," and together with the Perlman Entities, "Plaintiffs"), by and through their undersigned attorneys Quinn Emanuel Urquhart & Sullivan, LLP, for their Amended Complaint against Defendants Leslie Roberts ("Roberts"), Miami Fine Art Gallery LLC ("MFAG," and together with Leslie Roberts, the "MFAG Defendants"), and Alex Herman (together with the MFAG Defendants, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. This case involves a multi-million-dollar art fraud. Plaintiffs are a family of art collectors and the various entities through which they acquire and own artwork. Defendants Roberts and Miami Fine Art Gallery are con artists who traffic in forged artwork and who executed

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

an elaborate plan to sell Plaintiffs numerous inauthentic works purportedly by the iconic American artist Andy Warhol.

2. Plaintiffs met Roberts in February 2023 when Matthew and Richard Perlman visited his gallery, the Miami Fine Art Gallery (the "Gallery"), in Miami, Florida. Plaintiffs were impressed by the artwork exhibited at the Gallery and the representations Roberts made about his and MFAG's background and connections in the art world. Plaintiffs were particularly excited to see that MFAG was selling a work by the artist Richard Orlinsky, which they discussed with Roberts and ultimately purchased.

3. Plaintiffs and the MFAG Defendants quickly built a strong relationship around art and began discussing additional opportunities for Plaintiffs to expand their collection. During this time, Roberts told Plaintiffs that he had direct access to works owned by the Andy Warhol Foundation for the Visual Arts, Inc. (the "Foundation"), a New York–based Foundation that was created in accordance with Andy Warhol's will. The Foundation received a significant inventory of authentic Warhol artwork from Warhol's Estate, and Roberts said that he was in a position to acquire these works directly from the Foundation at discounted prices.

4. Roberts was a known art dealer, with a significant public gallery, a long history in the art world, and a seemingly large inventory of important artwork. He appeared to be trustworthy and knowledgeable. Plaintiffs trusted his expertise and began acquiring works from MFAG that Roberts claimed to have sourced from the Foundation.

5. After Plaintiffs bought several works, Roberts proposed that the parties form a joint venture, through which the Plaintiffs and the MFAG Defendants would jointly purchase artwork from the Foundation, sell it, and split the proceeds. Plaintiffs would provide half the capital

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

required to make the purchases, and Roberts and MFAG would provide the other half of the funds and all of the expertise.

6. Soon after, SOFLAC and MFAG entered a joint venture agreement (the "JV Agreement") and formed a joint venture (the "Joint Venture"), under which the parties agreed that SOFLAC would pay half of the purchase price for each work from the Foundation, MFAG would pay the other half of the purchase price, MFAG and Roberts would sell the works, and SOFLAC and MFAG would split the profits of each sale.

7. In practice, Roberts would propose artworks to Richard, Judy, and/or Matthew Perlman, claiming that the works were being acquired directly from the Foundation; one or more of the Perlmans would select the works they favored; Roberts would send them an invoice or written request for payment from MFAG or, in some instances, an invoice that appeared to be from the Foundation; the Perlmans or one of the Perlman Entities would pay MFAG their half of the purchase price; and MFAG and Roberts would ship them the purchased work. Roberts represented that MFAG had paid the full purchase price directly to the Foundation.

8. Roberts eventually put Plaintiffs directly in touch with his supposed contact at the Foundation, an individual named Alex Herman. Herman communicated directly with Matthew Perlman about the background of these transactions. He explained, for example, that the Foundation was selling inventory to fund its grants program, which benefited emerging artists and the visual arts. He noted the quality of the works, as well as the verification that each work had purportedly received from the Andy Warhol Art Authentication Board. The MFAG Defendants participated in and received many of these emails at MFAG's email account. Plaintiffs relied on the MFAG Defendants' representations that MFAG had paid the entire purchase price directly to the Foundation, that Plaintiffs' payments to MFAG constituted reimbursement for SOFLAC's

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

portion of the purchase price, that Alex Herman was the MFAG Defendants' contact at the Foundation, and that Plaintiffs were acquiring authentic Warhol works.

9. In total, Plaintiffs paid the MFAG Defendants over $6,000,000 to acquire what Defendants represented to be artworks by Andy Warhol to which the Foundation had given MFAG special access.

10. Plaintiffs MPC-401K, Judy Perlman, and Richard Perlman (the "Consigning Plaintiffs") also consigned numerous other artworks from their own collections (the "Consigned Works") to MFAG, which MFAG and Roberts promised to display and sell.

11. In December 2023, Richard and Judy Perlman asked Christie's auction house to view the collection of purported Andy Warhol artworks Plaintiffs acquired through MFAG. Christie's viewed the works that month and, during that visit and in a subsequent phone call, expressed concerns about the authenticity of the works, which the Perlmans immediately communicated to the MFAG Defendants.

12. The MFAG Defendants responded that another reputable auction house, Phillips, was ready to visit the Perlmans' home and evaluate, authenticate, and appraise the works.

13. Several weeks later, two individuals, who identified themselves as Carlos Rodriguez and Maria J. Urdaneta Frites, arrived at Richard and Judy Perlman's Florida home. Carlos and Maria identified themselves as employees of Phillips and handed out business cards to confirm their employment. Carlos and Maria inspected the works and conveyed their approval: these were authentic Warhols. They also said the appraisal would soon be forthcoming.

14. As it turned out, however, the works Plaintiffs had acquired through MFAG and Roberts, supposedly from the Foundation, were not by Andy Warhol; they were forgeries. The Foundation does not use the invoice format provided by Roberts and MFAG, it does not sell

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

significant works on canvas at major discounts, and it did not own the works that Roberts and MFAG acquired for Plaintiffs. Nor does the Foundation employ an individual named Alex Herman. Herman's email address, alex@andywarholfoundation.co, is not a legitimate Foundation email account; the Foundation's email domain is @warholfoundation.org.

15. Upon information and belief, the individual named Alex Herman is simply an email address that Roberts created and operates to impersonate a supposed Foundation employee.

16. If Herman is a real person separate from the MFAG Defendants, then Defendants are engaged in a criminal enterprise and conspiracy in violation of Florida's RICO statute.

17. Moreover, Phillips Auctioneers does not employ anyone named Carlos Rodriguez or Maria J. Urdaneta Frites. And although their business cards identified the correct address and phone number of Phillips Auctioneers, the business cards are otherwise inconsistent with business cards issued by Phillips. For example, the colors and format do not match, and the listed job titles do not exist at Phillips. The business cards are forgeries.

18. Phillips confirmed these facts on August 22, 2024, and Richard Perlman subsequently confronted Roberts about these fictitious Phillips employees. Roberts initially claimed that he found these employees through "Phillips International," so the domestic Phillips office that Plaintiffs had communicated with would not be able to confirm or deny their employment status. These statements were false, and Roberts later admitted, inadvertently, to Richard Perlman that Carlos actually worked for MFAG.

19. Defendants' fraud was unraveling. Plaintiffs therefore demanded that the MFAG Defendants immediately provide evidence showing the authenticity of the artwork they acquired, as well as all bank records demonstrating that MFAG had paid the Foundation for these purchases.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

They further demanded that the MFAG Defendants cease doing any business related to the venture and return the Consigned Works.

20. The MFAG Defendants repeatedly promised to deliver bank records and evidence of authenticity, but they failed to do so. And the MFAG Defendants refused to return the Consigned Works unless the Consigning Plaintiffs agreed to several unreasonable conditions that Plaintiffs had no obligation to accept. MFAG and Roberts were unable to provide evidence of wiring funds to the Foundation because they never wired funds to the Foundation. Instead, MFAG and Roberts created fake invoices showing purchases from the Foundation that were never actually made and pocketed the funds that Plaintiffs had wired for these acquisitions.

21. Les Roberts and Miami Fine Art Gallery (and Alex Herman, if he exists) are fraudsters. They must be held accountable. Plaintiffs have filed this lawsuit to stop Defendants' fraudulent scheme, remedy Defendants' wrongdoing, and obtain possession of their Consigned Works.

## **PARTIES**

22. Plaintiff SOFLAC Associates, LLC is a Florida limited liability company with an address at 5300 W. Atlantic Avenue, Suite 412, Delray Beach, FL 33484. SOFLAC was formed on May 8, 2023, to be MFAG's counterparty to the JV Agreement. SOFLAC is managed by SOFLAC, Inc., of which Richard Perlman is President and Matthew Perlman is Vice President.

23. Plaintiff RMP Investments, LLC is an Illinois limited liability company with an address at 875 N. Michigan Ave., Suite 3840, Chicago, IL 60611.

24. Plaintiff McAndrew Phillips & Company 401K Plan is an employee benefit trust of which Plaintiffs Richard and Judy Perlman are beneficiaries.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

25. Plaintiff Matthew H. Perlman is a resident of California. He is a Member and the Secretary of SOFLAC Associates, LLC.

26. Plaintiff Richard M. Perlman is a resident of Florida. He is a Member and the President of Plaintiff SOFLAC Associates, LLC; a Member and Manager of Plaintiff RMP Investments, LLC; and a beneficiary of Plaintiff McAndrew Phillips & Company 401K Plan.

27. Plaintiff Judy Perlman is a resident of Florida, and a beneficiary of Plaintiff McAndrew Phillips & Company 401K Plan.

28. Defendant Miami Fine Art Gallery LLC is an art gallery located at 3180 Commodore Plaza, Miami, FL 33133.

29. Defendant Leslie Roberts is a resident of Miami, Florida and the manager and director of Defendant Miami Fine Art Gallery LLC.

30. Upon information and belief, Alex Herman is a fictitious person created or impersonated by Roberts. In the alternative, to the extent Herman is a real person separate from Roberts, he is a co-conspirator of Defendants Roberts and MFAG whose true identity will be discovered in the course of this litigation.

## JURISDICTION & VENUE

31. The Miami-Dade County Circuit Court for the Eleventh Judicial Circuit has subject-matter jurisdiction over this action under Florida Statutes sections 26.012(2)(a) and 26.012(2)(c).

32. Venue is proper in this court under Florida Statutes section 47.051 because the causes of action accrued in Miami-Dade County, Florida. Venue is also proper because the contracts at issue required performance in Miami-Dade County.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

33. This Court has personal jurisdiction over Defendants Roberts and MFAG under Florida Statutes section 48.193(1)(a)(1) based on their operating, conducting, engaging in, and carrying on a business in Florida; under Florida Statutes section 48.193(1)(a)(2) based on their commission of tortious acts within Florida; and under Florida Statutes section 48.193(1)(a)(7) because they breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

34. To the extent Defendant Alex Herman is a real person separate from Leslie Roberts, this Court has personal jurisdiction over Herman under Florida Statutes sections 48.193(1)(a)(2) and (7) based on his commission of tortious acts within Florida and because he breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

35. This case is properly assigned to the Complex Business Litigation Division of the Eleventh Judicial Circuit given the potential for significant impact on the business of the Joint Venture and the Gallery, the pretrial management of a large number of witnesses, the substantial amount of documentary evidence involved, the potential need for a high degree of case management, including the handling of discovery disputes, and because the amount in controversy is likely to far exceed $750,000, exclusive of interest, costs, and attorneys' fees.

36. All conditions precedent to the filing of this action, if any, have occurred, been performed, or been excused or waived.

## FACTUAL ALLEGATIONS

**A. Defendants target Plaintiffs for their fraudulent scheme**

37. Although the Perlmans do not have specialized training or an educational or professional background in art, they personally enjoy collecting art.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

38. In February 2023, while shopping in the Coconut Grove neighborhood of Miami, Matthew and Richard Perlman walked into MFAG and were introduced to its owner, Les Roberts.

39. Impressed by MFAG's prominent location, large physical footprint, and apparent collection of artworks by numerous well-known artists, Plaintiffs began purchasing artwork from MFAG. Although the first work they purchased was by an artist named Richard Orlinsky, Matthew and Richard Perlman noticed what appeared to be an extensive inventory of works by Andy Warhol hanging in the gallery.

40. Plaintiffs quickly built a strong relationship with Roberts. They discussed art collecting, art investment, and, most prominently, works by Andy Warhol. During these initial conversations—which occurred at various times during the first half of 2023, including between Roberts and Matthew and Richard Perlman in person at the Gallery and at lunch meetings at Green Street Café and Atchana's Homegrown Thai Restaurant, and through phone calls and text messages between Roberts and Matthew Perlman—Roberts represented that he had a close relationship with the Foundation. He explained that he could acquire works directly from the Foundation and offer them to Plaintiffs at below-market prices. Plaintiffs were thrilled: Warhol was one of their favorite artists, and they were eager to collect his work.

41. The MFAG Defendants subsequently sold Plaintiffs works that the MFAG Defendants represented to be by Andy Warhol. The MFAG Defendants sent invoices and other writings to Plaintiffs, stating that the works were by Andy Warhol and requesting payment in exchange for transferring title and possession of the artworks.

42. Some of the artworks were paid for by RMP, some of the artworks were paid for by MPC-401K (both RMP and MPC-401K were funded by monies from Richard and Judy Perlman), and some of the artworks were paid for by Matthew Perlman. MFAG knew which

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Plaintiff paid for each work and that each sale it made was connected to MFAG and Roberts' efforts to sell the Plaintiffs artworks that they falsely represented were by Andy Warhol. In each instance and with respect to each artwork, MFAG, led by Roberts, made the same or substantially the same misrepresentations described above to one or more of the Plaintiffs at or around the time of sale.

43. Plaintiffs relied on the MFAG Defendants' oral representations and written statements in the invoices and related writings, and they therefore wired the requested funds to acquire the works from MFAG.

44. As to each individual work, the MFAG Defendants' fraudulent statements were made shortly before Plaintiffs made payment for that work.

**B. Defendants propose forming a joint venture**

45. After a number of sales, Roberts told Plaintiffs that they should form a joint venture, together through which they would purchase artwork from the Foundation. Roberts proposed that the parties to the joint venture each pay half of the purchase price to the Foundation, the MFAG Defendants would then sell the works to museums and other collectors and galleries, and the parties would equally split the proceeds.

46. But the MFAG Defendants had no intention of creating a legitimate venture. Their proposal was a ruse to help legitimize Defendants' fraudulent scheme and increase the volume of fraudulent sales they could make to Plaintiffs.

47. On or about August 22, 2023, MFAG and SOFLAC entered into the JV Agreement. A true and correct copy of the JV Agreement is attached as **Exhibit A**.

48. According to the JV Agreement, "[t]he purpose of the Venture is to acquire, hold, and sell the Collection," which the JV Agreement defines as "certain pieces of original Andy

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Warhol artwork procured from the *Andy Warhol Foundation for the Visual Arts, Inc.* ('AWF') and, also procured from other sources, including certain pieces of original 'Mr. Brainwash' artwork, and such other art collections as may, from time to time, be added to this Agreement . . . and signed-off by the parties hereto . . . ." (Ex. A, § 2; *id.* at 1 (Preamble).) But the joint venture never acquired any authentic works of art from the Foundation, and Defendants' representations to Plaintiffs that they were acquiring works from the Foundation were knowingly false.

49. Section 1 of the JV Agreement states that "[t]o date, [MFAG] and [SOFLAC] have each contributed $345,000.00 toward the purchase of the Collection and will each contribute an additional $99,000 . . . to complete the purchase of the Collection from AWF and other sources for a total purchase price of $870,000.00." (*Id.*, § 1.) It further states that "[u]pon completion of" the $99,000 contribution, MFAG and SOFLAC "will each have contributed $444,000 to purchase the Collection." (*Id.*)

50. SOFLAC contributed the funds required of it under the JV Agreement.

51. MFAG failed to contribute any of the required funds, and it never had any intention of contributing funds toward the purchases because the MFAG Defendants were not actually acquiring works from the Foundation.

52. Section 3 of the JV Agreement states that MFAG and SOFLAC "shall each have a fifty percent (50%) ownership interest in the Venture" and "shall share equally in the acquisition and the profits and losses of the Venture." (*Id.*, § 3.)

53. But MFAG never "share[d] equally" in any of the acquisitions. Instead, the money came from SOFLAC, or from Plaintiffs on behalf of SOFLAC, and the MFAG Defendants falsely represented that MFAG had paid its required share.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

54. Section 4(c) of the JV Agreement states that "no Venture Partner shall have the right to . . . borrow or lend money on behalf of the Venture . . . ." (*Id.*, § 4(c).)

55. Section 5(a) of the JV Agreement makes MFAG, as "Operating Venture Partner," responsible for "handling the operational duties of the Venture" and serving as the "primary sales agent (and fiduciary) of the Venture for the sale of the Collection or any Piece thereof . . . and the proceeds derived thereof," which MFA was required to hold in trust. (*Id.*, § 5(a).)

56. Section 9 of the JV Agreement states that "[a]ll books and records of the Venture, whether maintained by the Venture, [MFAG], [SOFLAC], or the Gallery shall be open to the Venture Partners for review and inspection at all times." (*Id.*, § 9.) MFAG has breached this provision by refusing to give SOFLAC access to the records related to its purchases.

57. Section 15(d) of the JV Agreement states that "[i]n the event of any litigation arising under this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its reasonable attorney's fees and court costs." (*Id.*, § 15(d).)

58. Throughout 2023 and 2024, SOFLAC paid several million dollars to purchase works under the JV Agreement. To complete each transaction, Plaintiffs wired half the purchase price to MFAG on behalf of SOFLAC. In doing so, Plaintiffs relied on the MFAG Defendants' representations that MFAG had paid the entire purchase price to the Foundation and that Plaintiffs' payment constituted a reimbursement of their half of the purchase price that MFAG had just paid.

59. But the MFAG Defendants did not acquire these works from the Foundation. The works they sold to SOFLAC under the JV Agreement were forgeries, and the MFAG Defendants therefore never sent any of the funds to the Foundation. Instead, the MFAG Defendants stole Plaintiffs' payments.

60. True and correct copies of several of the invoices the MFAG Defendants sent SOFLAC are attached as **Composite Exhibit B.** For example, the MFAG Defendants sent Plaintiffs the following invoices, purportedly from the Foundation, but they are forgeries:



INVOICE # 3344 INVOICE DATE 05/07/2023

BILL TO
Mathew Perlman
Miami Florida

Miami Fine Art Gallery
3180 Commodore Plaza
Miami Fl 33133

| QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 | Andy Warhol Marilyn Monroe #28 AWF Stamp | 22,000.00 | 22,000.00 |
| 1 | Andy Warhol Original Screenprint Komodo Dragon Stamped | 23,000.00 | 23,000.00 |
| 1 | Andy Warhol Orangutan Artist Proof Color | 18,000.00 | 18,000.00 |
| 1 | Andy Warhol Butterfly Artist Proof Color | 20,000.00 | 20,000.00 |
| 1 | Andy Warhol Cow Yellow pink Stamped 50/50 split | 11,250.00 | 11,250.00 |
| 1 | Andy Warhol. Cow Blue Stamped | 11,250.00 | 11,250.00 |
| 1 | Andy Warhol Cow Purple Stamped | 11,250.00 | 11,250.00 |

INVOICE TOTAL $116,750.00

Please Wire Funds to
Amerant Bank
Swift/BIC Code. MNBMUS33
ABA, 067010509



Invoice

Andy Warhol Foundation
65 Bleecker Street
New York New York 10012

Les Roberts
Miami Fine Art Gallery
3180 Commodore Plaza.
Miami Florida 33133

Andy Warhol Foundation
sales@warholfoundation.org

Invoice#: 9144
Issued: [redacted]
Due: 1/8/2024

PAID

Invoice Total
$416,000.00

| Item Description | Price | Quantity | Total |
|---|---|---|---|
| Andy Warhol Original Canvas. Panda | $1.00 | 75,000.00 | $75,000.00 |
| Andy Warhol Original Canvas Venus | $1.00 | 65,000.00 | $85,000.00 |
| Andy Warhol Original Canvas Queen Elizabeth | $1.00 | 85,000.00 | $85,000.00 |
| Andy Warhol Panda. REX. Test Print | $21,000.00 | 1.00 | $21,000.00 |
| Andy Warhol Eagle. Test Print | $21,000.00 | 1.00 | $21,000.00 |
| Andy Warhol Hotel Gos Test Print | $34,000.00 | 1.00 | $34,000.00 |
| Andy Warhol Ingrid Bergman Test Print | $1.00 | 20,000.00 | $20,000.00 |
| Andy Warhol Canvas Original Chanel | $1.00 | 85,000.00 | $85,000.00 |



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

61. Among numerous other forged artworks, Defendants sold the following forgeries to Plaintiffs that they falsely claimed to have acquired from the Foundation:














NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

62. Attached as **Exhibit C** is a schedule of purported "Warhol" artworks the MFAG Defendants sold Plaintiffs and for which Plaintiffs made payments. At minimum, Plaintiffs purchased the pieces described in this schedule as well as those enumerated in the exhibits to the JV Agreement, in reliance on the MFAG Defendants' false representations of their authenticity and provenance.

63. The MFAG Defendants knew these artworks and the corresponding invoices were forgeries.

**C. Defendants then went another step to convince Plaintiffs they were dealing directly with the Foundation**

64. To sustain Plaintiffs' belief in the legitimacy of the joint venture, the MFAG Defendants caused Plaintiffs to believe they were dealing directly with someone from the Foundation. Every communication about these subjects was a lie.

65. On December 17, 2023, Matthew Perlman received an email from "Alex Herman," who identified himself as an employee of the "Andy Warhol Foundation." Herman's email stated that he was "asked to reach out to you from one of our partner Galleries" because "[w]e understand you need us to verify unpublished Andy Warhol Prints in your collection." The email continued, "What I understand is that you have test prints (TP) in your collection. Those Screenprints were made by Andy so he could design the final colors and ideas for the regular edition run." The email further explained that although these "test prints" were not meant for sale to the public, "We here at his Foundation" have decided to sell a small number of them to "a few selective honorable Art Galleries who support our ongoing efforts to support the Arts." The email continued, "I understand that many Warhol sellers are unfamiliar with these prints as they have never been in circulation," but that a few of them "have been listed in our Full Warhol Volume Set which I highly recommend

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

you purchase." Herman further stated that "if you need to send me any photos I can verify if those are from the Foundation or any other part of our organization."

66. The following day, Matthew Perlman responded to Herman's email as follows: "I will send you a longer email shortly but I wanted to let you know that those 3 [test prints] are for my personal collection and my family art collective." In reply, Herman wrote that he had just received a wire from MFAG for works that Matthew Perlman and MFAG had purchased from the "foundation." Herman further represented that he had "received a message that you may acquire the Andy Warhol Original Blue John Lennon," stating that it "is an excellent investment" because it is "quite large."

67. On December 21, 2023, Herman wrote to Matthew Perlman and represented that the Foundation was "looking to sell one of the Original Warhol Canvases of The Royal Queen Elizabeth to fund the Andy Warhol Visual Art Scholarship Awards 2024." Herman represented that the work was "[s]igned by Andy Warhol" and included a "[s]tamp by the Foundation and Authentication Board and the rare Estate Stamp." "Per our Agreement with [MFAG]," Herman wrote, "you have the first right to purchase . . . this rare one," for a purchase price of $82,500.

68. On December 24, 2023, Herman offered to sell four more "Andy Warhol Canvas[es]" to Plaintiffs, stating that he needed to "raise additional funding for The Andy Warhol Visual Arts program" to support emerging artists. The total purchase price for these four works was $282,500.

69. On December 26, 2023, Herman wrote to Matthew Perlman and MFAG, stating that it was "truly a gift to work with [MFAG]," and applauding "Les and Matthew for giving massive support" to Warhol's dream of supporting artists. Herman represented that he had received a bank wire from MFAG for previous "Warhol Canvases" and that the money "will be

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

use[d] to promote the Andy Warhol Foundation." In the same email, Herman stated that he was authorized to offer an "Original Canvas of John Wayne" by Andy Warhol. Herman stated that the work was "highly valued," and that he would offer it to Matthew Perlman and MFAG for $75,000 to "show you how much I enjoy working with your Gallery."

70. On December 27, 2023, Herman wrote to Matthew Perlman to offer "the Original Canvas of [Andy Warhol's] Superman." In the same email, Herman wrote that the "Superman Canvas" was previously "on display . . . in Pittsburgh," where the Andy Warhol Museum is located. Herman further represented that artists "from around the world" would benefit from Matthew Perlman's and MFAG's purchases and that, "[k]eeping with our agreement, [MFAG] always gets the first-choice offer" of works from the Foundation. Herman further represented that "[o]nce our full staff is back from the Holidays, they will be able to pull all the [Authentication Board] letters you need from each location."

71. On January 3, 2024, Herman wrote again to Matthew Perlman and MFAG to announce a new fundraising initiative. "As you know," Herman wrote, "we have been funding Grants and Cash Awards to Artist and Art Projects throughout the United States." As a continuation of that work, Herman stated that he had "until January 30, 2024" to "raise additional funds by selling several of" Warhol's works "to a few collectors, and Galleries, who have given us tremendous support in 2023." The email continued by stating that the Foundation "will be granting a record number of grantees" in 2024 and that, as a result, Herman would "be allowing" rare canvases and photography "to be sold to complete this round of Grants, and the expansion of" the Foundation's support for visual arts. "Keeping to our agreement," Herman wrote, MFAG "has first right of acceptance." Due to a "pressured time limit," Herman requested that Matthew Perlman and Roberts let him know as soon as possible if they were interested in eight works for

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

which Herman was able "to give [them] very exceptional pricing." The total purchase price was $515,000 for the eight works, which included a "Warhol Canvas Cow," a "Warhol Canvas Mao Estate Portrait," a "Darth Vader Canvas 1976," a "First Chanel Canvas," a "Panda Canvas," a "Polo Player Canvas," a "Venus Canvas," and a "Queen Elizabeth Canvas."

72. On May 9, 2024, Herman wrote to Matthew Perlman and Roberts to offer a "very rare Andy Warhol" entitled "Paloma Picasso," which "Andy did in 1975" as a "Signed and Numbered Edition." Herman stated that the work was priced at $38,000; however, due to a $20,000 credit from the work's previous owner, he was authorized to "close it out to you for 18,000." Herman further stated that the reason for the sale was that the Foundation's new director "wants us to clear up all debit balances" and that he would bring similar "credit deals . . . on uncompleted past deals" because Plaintiffs and MFAG were "very strong buyers."

73. That same day, in response to Herman's email (and with Matthew Perlman on copy), Roberts wrote that he would "talk with [Matthew] later today." Roberts further stated that it was "a very good offer," that he knew the "Warhol Picasso" was "rare" as he had "never seen those available," and that he would let Herman know soon if they wished to purchase it.

74. On May 20, 2024, Herman wrote to Matthew Perlman and MFAG and represented that he had been "authorized to offer you a Warhol that is extremely special and rare," a "rendition that Andy Warhol did of his famous John Wayne." Herman further represented that the work, which was "done by his hand and on Museum Board," had a "perfect signature by Andy." The purchase price was $150,000.

75. On May 28, 2024, Herman wrote to Matthew Perlman and MFAG, "Yesterday I emailed you an offer to purchase the 2 remaining Canvases of the Dollar Sign and Marilyn Monroe." Herman further stated that "it is ok to assume" that SOFLAC and MFAG were passing

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

on these works, which would be offered to a different buyer because Herman hadn't heard back from Matthew Perlman and MFAG. That same day, Roberts responded to Herman's email, stating that the previous day was a holiday "so we were busy with Gallery events," but that he had "just sent [Herman] a wire for $120,000" for the "Warhol canvases"—"[s]o they belong to us now," referring to MFAG and SOFLAC. Herman responded the same day to confirm "receipt" of a $120,000 wire "from [MFAG] for the purchase of the 2 Warhol Canvases."

76. On July 31, 2024, Herman wrote to MFAG, Matthew Perlman, and Richard Perlman to offer two "rare Andy Warhol Canvases" in "[k]eeping with our commitment right of purchase." The works, entitled "Panda With Drum" and "Monkey Bars," were being offered for $55,000 each. Herman further represented that both works were "Stamped [and] Signed on Reverse."

77. That same day, Herman wrote to MFAG, Matthew Perlman, and Richard Perlman to "offer one of Andy Warhol's favorite paintings" in "[k]eeping with our commitment right of purchase," for a purchase price of $76,000.

78. By the beginning of August 2024, Plaintiffs had contributed millions of dollars to the JV's purchase of works, all of which purportedly came from the Foundation. In doing so, Plaintiffs relied on Defendants' representations that MFAG had paid the entire purchase price to the Foundation and that Plaintiffs' payments to MFAG constituted a reimbursement of SOFLAC's half of the purchase price that MFAG had just paid.

79. Plaintiffs further relied on representations by Roberts and Herman—who, upon information and belief, is a fictitious character played by Roberts—that each work was an authentic work created by Andy Warhol, that each work came from the Foundation, and that the joint

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

venture's purchase of each work would support the Foundation's mission of supporting artists around the world.

80. These representations were false, and Defendants knowingly participated in each of these misrepresentations, with the intent of inducing Plaintiffs make payments for worthless forgeries. As examples of the myriad falsities contained in Defendants' statements, Herman is not employed by the Foundation, his email address is not a legitimate email address of the Foundation, the Foundation wasn't selling works to fund scholarships, the Foundation does not give "cash awards" directly to artists, the Foundation did not have a "new director" who was demanding that the Foundation's debit balances be paid, the works Plaintiffs acquired were not owned by the Foundation, the invoices and the authentication stamps associated with the works were not authentic, and the MFAG Defendants were not sending funds to the Foundation in connection with Plaintiffs' purchases. Defendants knew each of these facts and knowingly engaged in and furthered this fraud to deceive Plaintiffs into paying millions of dollars for forged artwork.

**D. The fraud begins to unravel**

81. In December 2023, Judy Perlman approached Christie's Auction House to sell some of the works that Plaintiffs had purchased through MFAG. Christie's viewed the works that month and, shortly after, informed Plaintiffs that they had concerns about the authenticity of the works.

82. When Plaintiffs confronted Roberts with the information they had received from Christie's and demanded an explanation, Roberts doubled down, representing to Plaintiffs that the works were authentic. Meanwhile, Herman (impersonated by Roberts) emailed Matthew Perlman and falsely stated that Christie's objected to the Foundation's sale of works by Andy Warhol not because they were forgeries, but because of an earlier agreement between the Foundation and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Christie's that gave Christie's the exclusive right to sell works from the Foundation's private collection. Roberts further stated that he had a relationship with Phillips and that appraisers from Phillips were ready to evaluate the works Plaintiffs had purchased.

83. Around this time, Plaintiffs also began to push Roberts for an explanation of Herman's identity and his connection to the Foundation. To explain why there was no documented affiliation between Herman and the Foundation, Roberts falsely stated that Herman is a consultant to the Foundation and is based in the United Kingdom.

84. During this period, the MFAG Defendants attempted to solicit tens of thousands more dollars from Plaintiffs for several additional purported "Warhol" artworks from the "Foundation," including pieces that were described as *Caroline of Monaco* (Original on Canvas), *Debra Harring* (2/2 Test Screenprint TP), *Speed Skater* (Mint Condition Signed and Number Used for 1980 Olympic Poster), *Blackgama (Judy Garland)* (Signed and Numbered).

85. A few months later, two individuals, purporting to be from Phillips, met with Plaintiffs at Defendants' direction, evaluated the works, and stated that the works were authentic.

86. In the months that followed, Plaintiffs continued to demand answers from Roberts, including backup invoices, proof of wire transfers to the Foundation, appraisals, and other documentation related to the works that had purportedly been purchased from the Foundation. Roberts failed to provide sufficient backup.

87. In August 2024, Plaintiffs contacted Phillips about the individuals who had visited their home to view the works. On August 22, 2024, Phillips informed Plaintiffs that these individuals had presented Plaintiffs with fake business cards and were not from Phillips. Plaintiffs again demanded an explanation from Roberts, and Roberts doubled down *again*, claiming that the individuals were from "Phillips International" and therefore wouldn't have been known to the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

domestic Phillips office that denied any relationship with them. These were lies. Roberts ultimately admitted that MFAG employed at least one of these individuals.

88. On August 24, 2024, Plaintiffs demanded that MFAG refund every purchase that Plaintiffs had made through MFAG. The Consigning Plaintiffs further demanded the return of several unrelated authentic works that they had consigned to MFAG for MFAG to display and sell on their behalf.

89. The Consigned Works include one work by Chuck Close, four artworks by David Hockney, eighteen works by Richard Prince, three works by Anne Truitt, one work by Fernando Botero, one work by Richard Dupont, four works by David Salle, two works by Yaacov Agam, one work by Milton Avery, four works by Wayne Thiebaud, five works by Richard Diebenkorn, one work by Naotaka Hiro, one work by Sam Francis, one work by Frank Stella, and two works by Julian Opie. A schedule containing further details sufficient to identify these works is attached as **Exhibit D.**

90. The MFAG Defendants refused to refund Plaintiffs' money, failed to provide backup for the purchases and said that MFAG would continue selling works acquired through the JV (even though they were forgeries), and refused to return the Consigned Works unless Plaintiffs agreed to various unreasonable conditions that Defendants have no legal right to demand.

91. Plaintiffs have retained the undersigned counsel and are obligated to pay them fees for their services.

## COUNT I
## BREACH OF CONTRACT UNDER JV AGREEMENT
## (BY SOFLAC AGAINST MFAG)

92. SOFLAC repeats and realleges each and every allegation contained in paragraphs 1 through 91 as if fully set forth here.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

93. On or about August 22, 2023, MFAG and SOFLAC entered into the JV Agreement.

94. The JV Agreement is a binding and enforceable contract.

95. The JV Agreement defined its purpose, in relevant part, as the "acquisition and subsequent resale by the Venture of certain pieces of original Andy Warhol artwork procured from the Andy Warhol Foundation for the Visual Arts, Inc."

96. Section 1 of the JV Agreement states that "[t]o date, [MFAG] and [SOFLAC] have each contributed $345,000.00 toward the purchase of the Collection and will each contribute an additional $99,000 . . . to complete the purchase of the Collection from AWF and other sources for a total purchase price of $870,000.00." (Ex. A, § 1.) It further states that "[u]pon completion of" the $99,000 contribution, MFAG and SOFLAC "will each have contributed $444,000 to purchase the Collection." (*Id.*)

97. Section 3 of the JV Agreement states that MFAG and SOFLAC "shall each have a fifty percent (50%) ownership interest in the Venture" and "shall share equally in the acquisition and the profits and losses of the Venture." (*Id.*, § 3.)

98. Section 5(a) of the JV Agreement made MFAG, as Operating Venture Partner, responsible for the operational duties of the Venture, which included the acquisition and sale of original Andy Warhol artworks. (*Id.*, § 5(a).)

99. Section 9 of the JV Agreement states that "[a]ll books and records of the Venture, whether maintained by the Venture, [MFAG], [SOFLAC], or the Gallery shall be open to the Venture Partners for review and inspection at all times." (*Id.*, § 9.)

100. Section 15(d) of the JV Agreement states that "[i]n the event of any litigation arising under this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its reasonable attorney's fees and court costs." (*Id.*, § 15(d).)

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

101. MFAG's performance of the JV Agreement, including in connection with its operational and fiduciary duties as Operating Venture Partner under Section 5(a), was subject to the implied covenant of good faith and fair dealing, which implicitly required MFAG to refrain from acquiring and inducing SOFLAC to contribute funds and make payments for artworks MFAG knew were not original Andy Warhol artworks and were not from the Foundation, but were instead forgeries from illegitimate sources.

102. MFAG breached the JV Agreement in numerous ways, including by: (1) failing to acquire authentic art from the Foundation or otherwise; (2) acquiring and soliciting payments from SOFLAC for forged artworks MFAG knew were not authentic Andy Warhol artworks and were not acquired from the Foundation; (3) failing to exercise good faith and fair dealing in connection with its operational duties as Operating Venture Partner, including with respect to its acquisition of artworks on behalf of the Joint Venture and collection of payments from SOFLAC; (4) failing to pay the money MFAG was required to contribute to the Joint Venture; (5) failing to "share equally in the acquisition and the profits and losses of the Venture"; and (6) failing to provide SOFLAC with access to "[a]ll books and records . . . maintained by . . . the Gallery."

103. SOFLAC fully performed its obligations under the JV Agreement.

104. As a direct, proximate, and foreseeable result of MFAG's breaches of the JV Agreement, SOFLAC has been damaged in an amount to be determined at trial.

105. Under section 15(d) of the JV Agreement, SOFLAC is entitled to recover "reasonable attorney's fees and court costs" incurred in this litigation.

WHEREFORE, Plaintiff SOFLAC Associates, LLC demands judgment in its favor against Defendant Miami Fine Art Gallery, LLC on Count I, an award of its actual and consequential damages, attorneys' fees and costs under section 15(d) of the JV Agreement, prejudgment and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

post-judgment interest at the prevailing statutory rates, and any other available relief this court deems just and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY
## (BY SOFLAC AGAINST MFAG)

106. SOFLAC repeats and reallege each and every allegation contained in Paragraphs 1-91 as if fully set forth here.

107. SOFLAC and MFAG are or were joint venturers under the JV Agreement.

108. Joint venturers owe fiduciary duties to each other, including the duty to deal with each other in utmost good faith, fairness, and honesty.

109. Section 5(a) of the JV Agreement acknowledges MFAG's role as fiduciary on behalf of the Joint Venture.

110. MFAG breached its fiduciary duties to SOFLAC, including through its myriad misrepresentations concerning the authenticity of the art MFAG acquired on behalf of the Joint Venture and its solicitation and misappropriation of payments from SOFLAC for forged artworks.

111. SOFLAC has been damaged by MFAG's breach of its fiduciary duties to SOFLAC.

112. Under Section 15(d) of the JV Agreement, SOFLAC is entitled to recover "reasonable attorney's fees and court costs" incurred in this litigation.

WHEREFORE, Plaintiff SOFLAC Associates, LLC demands judgment in its favor against Defendant Miami Fine Art Gallery, LLC on Count II, an award of its actual and consequential damages, attorneys' fees and costs under Section 15(d) of the JV Agreement, prejudgment and post-judgment interest at the prevailing statutory rates, and any other available relief this court deems just and proper.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## COUNT III
## DECLARATORY JUDGMENT REGARDING TERMINATION OF JV AGREEMENT
## (BY SOFLAC AGAINST MFAG)

113. SOFLAC repeats and reallege each and every allegation contained in Paragraphs 1-112 as if fully set forth here.

114. On or about August 22, 2023, MFAG and SOFLAC entered into the JV Agreement.

115. The JV Agreement is a binding and enforceable contract.

116. As set forth above, MFAG breached the JV Agreement and its fiduciary duties to SOFLAC in numerous ways, including by failing to pay the money it was required to contribute to the JV, failing to "share equally in the acquisition and the profits and losses of the Venture," failing to provide SOFLAC with access to "[a]ll books and records . . . maintained by . . . the Gallery," and failing to acquire authentic art from the Foundation or otherwise, and soliciting financial contributions and payments from SOFLAC for forged artworks.

117. Further, the purpose of the JV Agreement has been frustrated, given MFAG's lack of access to authentic Andy Warhol artworks from the Foundation and evisceration of SOFLAC's trust in the MFAG Defendants' ability to ever acquire such works.

118. SOFLAC fully performed its obligations under the JV Agreement.

119. The JV agreement lacks a termination provision, except in the event of the death or disability of Leslie Roberts or Matthew Perlman. (Ex. A, § 13).

120. SOFLAC seeks a declaration that, based on MFAG's material breaches of the JV Agreement, as alleged in Count I, MFAG's breaches of its fiduciary duties, as alleged in Count II, and the frustration of the purpose of the joint venture, SOFLAC is entitled to terminate the JV Agreement and that the JV Agreement has been terminated, without prejudice to SOFLAC's claims for damages and other relief against MFAG, as sought herein.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

121. There is a bona fide, actual, present and practical need for the requested declaration, including to prevent SOFLAC from incurring any further damages in connection with any attempts by MFAG to continue activities on behalf of the Joint Venture, including damages related to any purported obligation to continue making payments or monetary contributions under the JV Agreement, or potential exposure that may arise to third parties, should MFAG attempt to sell the forged artworks.

122. The declaration sought deals with a present, ascertainable state of facts or present controversy as to a state of facts.

123. SOFLAC's rights under the JV Agreement are dependent upon the facts or the law applicable to the facts as to which the requested declaration is sought.

124. MFAG purports to have an actual, present, adverse, and antagonistic interest in the JV Agreement and SOFLAC's entitlement to termination.

125. The antagonistic and adverse interests are all before the court by the proper process and representation.

126. The requested declaration sought is not merely giving of legal advice by this Court.

127. Under Section 15(d) of the JV Agreement, SOFLAC is entitled to recover "reasonable attorney's fees and court costs" incurred in this litigation.

WHEREFORE, Plaintiff SOFLAC Associates, LLC demands judgment in its favor against Defendant Miami Fine Art Gallery on Count III, an award of its attorneys' fees and costs under Section 15(d) of the JV agreement, and any other available relief this court deems just and proper.

## COUNT IV
## BREACH OF EXPRESS WARRANTY § 672.313, FLA. STAT.
## (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

128. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth here.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

129. Under section 672.313(1), Florida Statutes, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Critically, "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty[.]"

130. Plaintiffs purchased through Defendants, at a minimum, the works of art identified in Exhibit C and in the JV Agreement.

131. "Alex Herman," by way of Roberts, purportedly offered these works for sale to Plaintiffs and the Joint Venture, and the MFAG Defendants collected payments from Plaintiffs for them.

132. The purchase of each of these works (each, an "AWF Work") was memorialized by representations of authenticity from "Alex Herman" and the MFAG Defendants and, in most instances, a written contractual invoice representing that the works were authentic Andy Warhol artworks.

133. Plaintiffs fully performed their obligations under the parties' agreements with respect to the AWF Works acquired before the execution of the JV Agreement by making full payment for those works.

134. SOFLAC fully performed its obligations under the parties' agreements with respect to the AWF Works acquired through the Joint Venture, including by causing payments to be made for its required half of the purported purchase price for those works.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

135. In connection with each AWF Work, each of the Defendants made affirmations of fact related to the work and provided a description of the work, including, among other things, that it was an authentic work by Andy Warhol that came from the Foundation. These representations created express warranties of authenticity under section 672.313(1), Florida Statutes.

136. The AWF Works are not authentic, and they are not from the Foundation. Defendants have therefore breached their express warranties of authenticity.

137. As a direct, proximate, and foreseeable result of Defendants' breaches, Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants Leslie Roberts, Miami Fine Art Gallery, LLC, and Alex Herman on Count IV, an award of their actual and consequential damages, prejudgment and post-judgment interest at the prevailing statutory rates, and any other available relief this court deems just and proper.

**COUNT V**
**UNJUST ENRICHMENT**
**(BY ALL PLAINTIFFS AGAINST ROBERTS AND MFAG)**

138. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 as if fully set forth here.

139. This cause of action for unjust enrichment is pled in the alternative to Counts I and IV (Breach of Contract and Breach of Express Warranty) above.

140. The MFAG Defendants were enriched by the payments Plaintiffs made toward the purchase of the AWF Works.

141. The MFAG Defendants voluntarily accepted and retained the benefit of these payments.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

142. The MFAG Defendants have failed to compensate Plaintiffs with anything of value in exchange for Plaintiffs' payments.

143. The circumstances are such that it would be inequitable to allow Defendants to retain the benefits of Plaintiffs' payments and contributions without paying their value to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants Leslie Roberts and Miami Fine Art Gallery, LLC on Count V, an award of their actual damages, prejudgment and post-judgment interest at the prevailing statutory rates, and any other available relief this court deems just and proper.

**COUNT VI**
**FRAUD**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

144. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 above as if fully set forth here.

145. As described above, Defendants Roberts and MFAG knowingly made the following false statements of material fact to Plaintiffs, among others:

a. Each of the AWF Works is an authentic work by Andy Warhol that came from the Foundation;

b. Herman is an employee or consultant of the Foundation;

c. Plaintiffs' portion of the purchase price for each AWF Work would be received by the Foundation;

d. The Foundation would receive the other half of the purchase price for each AWF Work directly from MFAG; and

e. Plaintiffs' purchase of the AWF Works would support the mission and activities of the Foundation.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

146. As described above, Defendant Herman made the following representations, among others:

a. He is an employee or consultant of the Foundation;

b. Each of the AWF Works is an authentic work by Andy Warhol that came from the Foundation; and

c. Plaintiffs' purchase of the AWF Works would support the mission and activities of the Foundation.

147. Defendants' representations to Plaintiffs were false when they were made.

148. Upon information and belief, Herman is a fictitious person created or impersonated by Roberts. Therefore, the MFAG Defendants made and are responsible for each of Herman's misrepresentations.

149. Defendants made these false representations knowingly, with the intent to deceive Plaintiffs into paying Defendants for forged artworks that are neither authentic, nor from the Foundation.

150. Plaintiffs obtained these representations in writing and orally from Defendants and reasonably relied on those written representations, especially given Defendants' perceived stature in the art world, significant public gallery space, and long history of selling artwork.

151. Defendants' misrepresentations caused Plaintiffs damages, because Plaintiffs would not have purchased any of the AWF Works or wired any money to Defendants if Defendants had disclosed the truth about the AWF Works.

152. As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered economic harm totaling several million dollars.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

153. Defendants engaged in the fraudulent conduct described in this Complaint willfully and maliciously, with the intent to damage Plaintiffs. Defendants repeatedly lied to Plaintiffs about the AWF Works, Herman's identity, and the identity of the recipient of Plaintiffs' funds. They did so with the intent to harm Plaintiffs by stealing the millions of dollars they had wired to Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants Leslie Roberts, Miami Fine Art Gallery, LLC, and Alex Herman on Count VI, an award of their actual and consequential damages, prejudgment and post-judgment interest at the prevailing statutory rates, and any other available relief this court deems just and proper.

**COUNT VII**
**<u>VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 *ET SEQ.* (*"FDUTPA"*)</u>**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

154. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 above as if fully set forth here.

155. Section 501.204, Florida Statutes, prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

156. Defendants' practices, as described above, (*e.g.*, knowingly and intentionally inducing Plaintiffs to make payments to acquire inauthentic artworks), are unfair and deceptive.

157. As a result of Defendants' unfair and deceptive practices, Plaintiffs have been damaged.

158. Section 501.2105, Florida Statutes provides for an award of reasonable attorney's fees and costs to the prevailing party in any action brought under FDUTPA.

159. WHEREFORE, Plaintiffs demand judgment in their favor against Defendants Leslie Roberts, Miami Fine Art Gallery, LLC, and Alex Herman on Count VII, an award of their

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

actual damages, prejudgment and post-judgment interest at the prevailing statutory rates, attorneys' fees and costs under Section 501.2105, Florida Statutes, and any other available relief this court deems just and proper.

**COUNT VIII**
**LIABILITY UNDER § 772.103, FLA. STAT.**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

160. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 above as if fully set forth here.

161. Under Section 772.103, Florida Statutes, it is unlawful for any person (*inter alia*) to: (1) receive, with criminal intent, any proceeds derived from a pattern of criminal activity; (2) acquire or maintain through a pattern of criminal activity any interest in or control of any enterprise; (3) to conduct or participate in such enterprise through a pattern of criminal activity; or (4) to conspire or endeavor to do any of the above.

162. Upon information and belief, Herman is a fictitious person created or impersonated by Roberts. In the alternative, to the extent Herman is a real person separate from Roberts and MFAG, he is their co-conspirator, and together, they made up an informal association constituting an ongoing criminal enterprise.

163. Defendants knowingly engaged in a pattern of criminal activity intended to steal millions of dollars from Plaintiffs in a fraudulent scheme to sell forged artwork, using fictitious names and identities.

164. Defendants endeavored and conspired to conduct a criminal enterprise directed at Plaintiffs.

165. Defendants conducted and participated in a criminal enterprise directed at plaintiffs, through a pattern of criminal activity.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

166. Defendants received, with criminal intent, proceeds derived from their pattern of criminal activity directed at Plaintiffs.

167. Defendants' criminal enterprise consisted of a continuous series of related predicate acts in furtherance of their criminal activity, including, among other things, communications fraud in violation of Section 817.034, Florida Statutes (including wire fraud and mail fraud), trafficking in counterfeit goods, and the sale of artwork with false labels.

168. As a direct consequence of Defendants' predicate acts and criminal enterprise, Plaintiffs have suffered harm.

169. Plaintiffs are entitled to their reasonable attorney's fees and treble damages under Section 772.104(1), Florida Statutes.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants Leslie Roberts, Miami Fine Art Gallery, LLC, and Alex Herman on Count VIII, an award of three times their actual damages, prejudgment and post-judgment interest at the prevailing statutory rates, attorneys' fees and costs under Section 772.104(1), Florida Statutes, and any other available relief this court deems just and proper.

**COUNT IX**
**CONVERSION**
**(BY CONSIGNING PLAINTIFFS AGAINST ROBERTS AND MFAG)**

170. The Consigning Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-4, 10, 19-40, and 81-90 above as if fully set forth here.

171. The Consigning Plaintiffs, jointly or individually, own full title to the Consigned Works.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

172. The MFAG Defendants have no right to possess the Consigned Works, because MFAG has breached the terms of their consignment and because the Consigning Plaintiffs have the right to demand the return of the Consigned Works at any time.

173. The MFAG Defendants know that they have no right to possess the Consigned Works.

174. The MFAG Defendants know that they do not own the Consigned Works.

175. The Consigning Plaintiffs have demanded that the MFAG Defendants return the Consigned Works.

176. The MFAG Defendants have refused to return the Consigned Works unless the Consigning Plaintiffs agree to various conditions that Plaintiffs have no obligation to accept.

177. The MFAG Defendants have converted the Consigned Works to their own use and have deprived the Consigning Plaintiffs of their use and possession.

178. The Consigning Plaintiffs have been damaged as a result of the MFAG Defendants' unlawful conversion of the Consigned Works and seek compensatory damages for Defendants' wrongdoing in an amount to be determined at trial.

WHEREFORE, Plaintiffs McAndrew Phillips & Company 401K Plan, Judy Perlman, and Richard Perlman demand judgment in their favor against Defendants Leslie Roberts and Miami Fine Art Gallery, LLC on Count IX, an award of compensatory damages, and any other available relief this court deems just and proper.

**COUNT X**
**REPLEVIN**
**(BY CONSIGNING PLAINTIFFS AGAINST ROBERTS AND MFAG)**

179. The Consigning Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-4, 10, 19-40, and 81-90 above as if fully set forth here.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

180. Plaintiffs MPC-401K or Judy and Richard Perlman own full title to the Consigned Works, as identified in Exhibit D, which were duly acquired by them from reputable art dealers.

181. Defendants are wrongfully detaining the Consigned Works.

182. The MFAG Defendants have no right to possess the Consigned Works and have breached the agreed terms of their consignment.

183. The MFAG Defendants know that they have no right to continued possession of the Consigned Works.

184. The MFAG Defendants know that they do not own the Consigned Works.

185. The Consigning Plaintiffs have demanded that the MFAG Defendants return the Consigned Works.

186. The MFAG Defendants have refused to return the Consigned Works unless the Consigning Plaintiffs agree to various conditions that Plaintiffs have no obligation to accept.

187. The MFAG Defendants have no legitimate defense to the Consigning Plaintiffs' assertion of ownership over the Consigned Works.

188. The Consigning Plaintiffs have been damaged as a result of Defendants' wrongful detainer of the Consigned Works.

189. The Consigning Plaintiffs are entitled to the return of the Consigned Works and damages flowing from their unlawful detainer.

190. WHEREFORE, Plaintiffs McAndrew Phillips & Company 401K Plan, Judy Perlman, and Richard Perlman demand judgment in their favor against Defendants Leslie Roberts and Miami Fine Art Gallery, LLC on Count X, a writ of replevin to recover the Consigned Works from Defendants, an award of actual and consequential damages sustained by reason of

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Defendants' wrongful detainer of the Consigned Works, and any other available relief this court deems just and proper.

**COUNT XI**
**CONTRACTUAL ACCOUNTING**
**(BY SOFLAC AGAINST MFAG)**

191. SOFLAC repeats and realleges each and every allegation contained in Paragraphs 1-91 above as if fully set forth here.

192. On or about August 22, 2023, MFAG and SOFLAC entered into the JV Agreement, which is a binding and enforceable contract.

193. Section 9 of the JV Agreement states that "[a]ll books and records of the Venture, whether maintained by the Venture, [MFAG], [SOFLAC], or the Gallery shall be open to the Venture Partners for review and inspection at all times."

194. As a result of MFAG's wrongful conduct under the JV Agreement, MFAG owes SOFLAC a balance that can only be ascertained through an accounting, and MFAG has exclusive knowledge of and access to the information needed to determine the amount owed.

195. SOFLAC is also entitled to review the documentation related to each of the venture's transactions.

WHEREFORE, Plaintiff SOFLAC Associates, LLC demands judgment in its favor against Defendant Miami Fine Art Gallery, LLC on Count XI, an Order requiring MFAG to open its books and records to SOFLAC for an accounting and awarding attorneys' fees and costs under section 15(d) of the JV Agreement, and any other available relief this court deems just and proper.

**COUNT XII**
**EQUITABLE ACCOUNTING**
**(BY CONSIGNING PLAINTIFFS AGAINST MFAG)**

196. The Consigning Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-4, 10, 19-40, and 81-90 above as if fully set forth here.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

197. The Consigning Plaintiffs consigned the Consigned Works to MFAG for display and sale to third parties under agreed terms.

198. As consignee, MFAG has a fiduciary relationship to the consigning Plaintiffs.

199. MFAG's fiduciary duties to the Consigning Plaintiffs includes the duties to faithfully adhere to their instructions concerning the Consigned Works and to render a true and accurate account of its stewardship of the Consigned Works.

200. MFAG has failed and refused to provide open and full disclosure and a true and accurate accounting regarding the Consigned Works.

201. The Consigning Plaintiffs are unable to ascertain which of the Consigned Works have been sold and the sale proceeds received and due to them without a court-directed accounting.

202. MFAG has exclusive knowledge of and access to the books and records needed to determine the whereabouts of the Consigned Works and the amounts the Consigning Plaintiffs are owed with respect to those works.

WHEREFORE, Plaintiffs MPC-401K, Judy Perlman, and Richard Perlman demand judgment in their favor against Defendant Miami Fine Art Gallery, LLC on Count XII and an order directing MFAG to provide a full and accurate accounting with respect to the Consigned Works and any related sale proceeds and awarding any other available relief this court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and:

a. An award to Plaintiffs of the following:

  i. actual and consequential damages in an amount to be determined at trial for all injuries suffered as a direct and proximate result of Defendants' wrongdoing;

  ii. treble damages under Section 772.104(1), Florida Statutes;

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

iii. pre-judgment and post-judgment interest at the prevailing statutory interest rates;

iv. attorneys' fees and costs incurred in connection with this action under section 15 of the JV Agreement and Sections 501.2105 and 772.104(1), Florida Statutes;

b. A Declaration that the JV Agreement is terminated due to MFAG's breaches thereof and frustration of the JV's purpose;

c. A writ of replevin authorizing the seizure of the Consigned Works from the MFAG Defendants;

d. An order requiring MFAG to submit to:

i. a contractual accounting of the Joint Venture's books and records;

ii. an equitable accounting of MFAG's books and records with respect to the Consigned Works; and

e. All other further relief as may be appropriate.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs demand a jury trial on all counts so triable.

Dated: November 21, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

BY: *<u>/s/ Luke Nikas</u>*

Luke Nikas (*pro hac vice*)
Paul B. Maslo (*pro hac vice*)
Michael Nosanchuk (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
lukenikas@quinnemanuel.com
paulmaslo@quinnemanuel.com
michaelnosanchuk@quinnemanuel.com

*<u>/s/ Shalia Sakona</u>*
Shalia Sakona (FL Bar No. 107398)
Daniel Humphrey (FL Bar No. 1024695)
2601 South Bayshore Dr., Suite 1550
Miami, FL 33133

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Tel.: (305) 402-4880
shaliasakona@quinnemanuel.com
danielhumphrey@quinnemanuel.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint was served upon all counsel of record via the Florida Courts' e-filing system on this 21st day of November, 2024.

*/s/ Shalia Sakona*

Shalia Sakona, Esq.